# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS WEBSTER, | Case No. 1:18-cv-01640-BAM (PC) |
| Plaintiff, | ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | (ECF No. 71) |
| HASKINS, | |
| Defendant. | |

**I.   Introduction**

Plaintiff Thomas Webster ("Plaintiff") is a civil detainee proceeding *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983. Individuals detained pursuant to the California Welfare and Institutions Code § 6600 *et seq.* are considered civil detainees and are not prisoners within the meaning of the Prison Litigation Reform Act. *Page v. Torrey*, 201 F.3d 1136, 1140 (9th Cir. 2000). This action proceeds on Plaintiff's first amended complaint against Defendant Haskins ("Defendant") for denial of adequate medical care in violation of the Fourteenth Amendment. All parties have consented to Magistrate Judge jurisdiction. (ECF No. 49.)

On March 15, 2021, Defendant filed a motion for summary judgment on the grounds that: (1) there is no triable issue of material fact as to Plaintiff's sole cause of action against Defendant for violation of the Fourteenth Amendment, because Defendant was not deliberately indifferent to

Plaintiff's medical needs; and (2) no act or omission by Defendant caused Plaintiff to sustain any injury.[1] Fed. R. Civ. P. 56(c), *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc), *cert. denied*, 574 U.S. 968 (2014). (ECF No. 71.) Plaintiff timely filed an opposition to the motion for summary judgment on September 10, 2021, (ECF No. 83), and Defendant filed a reply on September 21, 2021, (ECF No. 88.) Plaintiff filed further exhibits in support of his opposition on September 29, 2021, (ECF No. 89), and Defendant filed objections to the exhibits on October 5, 2021, (ECF No. 90). The motion is deemed submitted. Local Rule 230(l).

## II.     Legal Standard

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Id.* (citing *Celotex*, 477 U.S. at 323). In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.*

---

[1] Concurrent with this motion, Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment. *See Woods v. Carey*, 684 F.3d 934 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1988); *Klingele v. Eikenberry*, 849 F.2d 409, 411–12 (9th Cir. 1988). (ECF No. 71-5.)

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis omitted). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.* at 929; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. The Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**III.   Discussion**

   **A.   Supplemental Index of Exhibits to Plaintiff's Opposition**

On September 29, 2021, Plaintiff filed an index of exhibits that he claims was inadvertently omitted from his opposition to Defendant's motion for summary judgment. (ECF No. 89.) Defendant filed objections on October 5, 2021. (ECF No. 90.)

Defendant contends that the Court should disregard the filing in its entirety, because by filing the documents after Plaintiff's reply was filed, Plaintiff has denied Defendant a meaningful opportunity to assess the merits of the documents and to adequately reply, Plaintiff seeks to cause unnecessary delay, and the documents appear to have little probative value. (*Id.*)

Generally, parties do not have the right to file sur-replies, and motions are deemed submitted when the time to reply has expired. Local Rule 230(l). The Court generally views motions for leave to file sur-replies with disfavor. *Hill v. England*, No. CVF05869 REC TAG, 2005 WL 3031136, at *1 (E.D. Cal. 2005) (citing *Fedrick v. Mercedes–Benz USA, LLC*, 366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005)). However, district courts have the discretion to either permit or preclude a sur-reply. *See U.S. ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1203 (9th Cir. 2009) (district court did not abuse discretion in refusing to permit "inequitable surreply"); *JG v. Douglas County School Dist.*, 552 F.3d 786, 803 n.14 (9th Cir. 2008) (district court did not abuse discretion in denying leave to file sur-reply where it did not consider new evidence in reply); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (new evidence in reply may not be considered without giving the non-movant an opportunity to respond). In this Circuit, courts are required to afford *pro se* litigants additional leniency. *E.g., Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012); *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012); *Silva v. Di Vittorio*, 658 F.3d 1090, 1101 (9th Cir. 2011); *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

The Court reviewed the proposed submission and the parties' arguments. In an abundance of caution and in light of Plaintiff's *pro se* status, Defendant's own admission that despite her inability to prepare a meaningful response she has determined the documents appear to have little probative value, and the Court's determination that the documents do not materially alter the analysis below, the documents are accepted for filing. Defendant's objections are therefore overruled.

**B.     Evidentiary Objections**

Plaintiff raises various objections to much of Defendant's Statement of Undisputed Material Facts, as well as to specific portions of the declarations of Defendant Haskins and Dr.

4

Mathis. (ECF No. 83.) In addition, Defendant raises rebuttals to Plaintiff's responses and objections to the Statement of Undisputed Material Facts, as well as objections to evidence submitted in support of Plaintiff's opposition.

As noted above, not every objection will be addressed by the Court individually, as doing so is neither necessary nor is that the practice of this Court in the summary judgment context. For the sake of clarity and to the extent it is appropriate, certain individual objections have been addressed by the Court below. Other objections are better dealt with here, in general terms.

The hearsay objections are overruled. Declarations which contain hearsay are admissible for summary judgment purposes if they can be presented in admissible form at trial. *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004). Furthermore, "[i]f the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay." *Calmat Co. v. U.S. Dep't of Labor*, 364 F.3d 1117, 1124 (9th Cir. 2004). At this stage, the Court did not find the hearsay objections raised to be preclusive of the evidence submitted, or that the statements objected to were, in fact, hearsay.

Defendant's objections to Plaintiff's evidence for lack of authentication, to the extent they refer to Plaintiff's institutional records or records generated during his stay at HRC, are overruled. Fed. R. Evid. 901(b)(4); *Las Vegas Sands, LLC v. Nehme,* 632 F.3d 526, 532–33 (9th Cir. 2011). While the records are subject to authentication under Rule 901(b)(6) in any event, the Court nonetheless notes the absence of any evidence or argument suggesting the existence of a legitimate challenge to the records on authentication grounds. *See Chamberlain v. Les Schwab Tire Center of Cal., Inc.*, No. 2:11-cv-03105-JAM-DAD, 2012 WL 6020103, at *2 (E.D. Cal. Dec. 3, 2012) (citing *Burch v. Regents of Univ. of Cal.*, 433 F.Supp.2d 1110, 1120 (E.D. Cal. 2006)) (rejecting "purely procedural" authentication objection).

Defendant's argument that Plaintiff has failed to provide supporting evidence for many of the facts which he claims are in dispute, is well taken. Federal Rule of Civil Procedure 56(c)(1) specifically requires that a party asserting that is genuinely disputed must support the assertion by "citing to particular parts of materials in the record . . . or showing that the materials cited do not

5

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Similarly, pursuant to Local Rule 260(b), a party opposing a motion for summary judgment is required to deny those facts that are disputed, "including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial." To the extent Plaintiff has identified that a fact is in dispute, but fails to provide supporting evidence or otherwise demonstrate that the evidence relied upon by Defendant is inadmissible, such fact will be accepted as undisputed.

With respect to Plaintiff's specific objections to the declarations submitted by Defendant Haskins and Dr. Mathis, Plaintiff must do more than attack the credibility of Defendant's evidence. *See National Union Fire. Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983) ("[N]either a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert . . . judgment."). Plaintiff's conclusory characterizations of portions of the declarations as false, "sham answers," or made in bad faith, without more, are insufficient to create a dispute of fact.

Defendant's argument that Plaintiff is not qualified to challenge the medical opinions of Dr. Mathis is also well taken. Plaintiff has not shown that he qualifies as an expert witness in order to be able to opine on the accuracy of Dr. Mathis' conclusions. *See* Fed. R. Evid. 702. As Plaintiff is a lay witness, the only admissible evidence he can provide on his own is limited to opinions that are rationally based on his perception; that are helpful to clearly understanding his testimony or to determining a fact in issue; and are not based on scientific, technical, or other specialized knowledge within the scope of Rule 702, such as medical opinions. *See* Fed. R. Evid. 701.

Finally, given the Court's duty to determine whether there exists a genuine dispute as to any material fact, objections to evidence as irrelevant are both unnecessary and unhelpful. *See e.g.*, *Carden v. Chenega Sec. & Protections Servs., LLC*, No. CIV 2:09-1799 WBS CMK, 2011 WL 1807384, at *3 (E.D. Cal. May 10, 2011); *Arias v. McHugh*, No. CIV 2:09-690 WBS GGH, 2010 WL 2511175, at *6 (E.D. Cal. Jun. 17, 2010); *Tracchia v. Tilton*, No. CIV S-062919 GEB

KJM P, 2009 WL 3055222, at *3 (E.D. Cal. Sept. 21, 2009); *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).

     **C.**    **Undisputed Material Facts ("UMF")**[2]

1. The original complaint was filed on March 13, 2018. (ECF No. 1.)

2. The Amended Civil Rights Complaint was filed on September 11, 2019. (ECF No. 24.)

3. The Court screened the First Amended Complaint, as required by 28 U.S.C. § 1915(e)(2) and, on October 10, 2019, the Court dismissed, for failing to state a claim on which relief may be granted, all but one cause of action. (ECF No. 25.)

4. The Court found that the First Amended Complaint sufficiently pleaded a cognizable claim against Defendant Natalie Haskins for violation of the Fourteenth Amendment for denial of adequate medical care arising out of Plaintiff's denial of his medication and ordered Plaintiff to amend or to proceed on the single cognizable claim. (*Id.*)

5. Plaintiff declined to amend the First Amended Complaint. (ECF No. 26.)

6. Defendant filed an Answer on March 30, 2020. (ECF No. 32.)

7. Plaintiff is, and was at all times relevant, a civil detainee of the California Department of State Hospitals. (ECF No. 71-4, Allingham Decl., ¶ 8; ECF No. 71-3, Exh. 7, DSH Files, WEBSTER_000001–53.)

8. Plaintiff was committed to DSH pursuant to Penal Code section 1026 as Not Guilty by Reason of Insanity in August 1994. (Exh. 7, DSH Files, WEBSTER_000005; WEBSTER_000047.)

9. At the time of his offense, Plaintiff was under the influence of drugs and alcohol and became psychotic when he shot and killed a man in a bar. (*Id.*)

///

---

[2] *See* Defendant's Separate Statement of Undisputed Material Facts in Support of Defendant Haskins' Motion for Summary Judgment, (ECF No. 71-2); Plaintiff's Opposition to Defendant's Statement of Disputed Facts for Summary Judgment, (ECF No. 83, pp. 47–59); and Defendant's Reply to Plaintiff's Response to Separate Statement of Undisputed Material Facts in Support of Natalie Haskins' Motion for Summary Judgment, (ECF No. 88-1). Unless otherwise indicated, disputed, duplicative, and immaterial facts are omitted from this statement and relevant objections are overruled.

10. The records indicate that Plaintiff has a history of methamphetamine use. (*Id.* at WEBSTER_000047.)

11. Plaintiff's diagnoses include polysubstance dependence, specifically methamphetamine; drug-induced psychotic disorder with delusions; and drug-induced psychotic disorder with hallucinations. (*Id.* at WEBSTER_000001–04, WEBSTER_000044–46.)

12. In 2017, Plaintiff obtained a recommendation for his participation in DSH's Forensic Conditional Release Program ("CONREP"). (*Id.* at WEBSTER_000017–22.)

13. As part of Plaintiff's conditional release, he signed a *Terms and Conditions of Outpatient Treatment* document wherein, among other terms, Plaintiff agreed on page 2 of 11, No. 6, under "Drugs/Substance Abuse Prohibition" to "not use, possess, handle, traffic in, transport, or otherwise be involved with any illegal narcotics/dangerous drugs or controlled substances." Plaintiff admits he was in violation of this term. (*Id.* at WEBSTER_000033–43 (as to entire document), WEBSTER_000034 (as to quotation).)

14. A failure to abide by those terms could result in revocation of his outpatient treatment status and a return to a DSH hospital. (*Id.* at WEBSTER_000033.)

15. On April 27, 2017, in Plaintiff's final violence risk assessment before discharge, the DSH physician, Dr. Pretkel, Psy.D., stated:

> Mr. Webster is not likely to commit violence when supervised in the community by CONREP. However, in the unlikely event he were to return to **frequent methamphetamine use similar to his level of use in the months before his instant offense, he would risk becoming dangerous and could again use a weapon against another person. He also use (*sic*) a weapon against himself.**

(*Id.* at WEBSTER_000029.)

16. Natalie Haskins is the Program Director at Haskins Residential Care ("HRC"). (Allingham Decl. ¶ 7; ECF No. 71-3, Ex. 6, Haskins Decl. ¶ 6.)

17. HRC provides assisted living and, at all times relevant, was operating under contract with the State of California to provide outpatient treatment for CONREP participants. (*Id.*)

1      18.    Defendant is neither a physician nor a registered nurse. (*Id.* ¶ 5.)

19.    On December 7, 2016, HRC entered into Agreement Number 16-78016-000 with DSH (The "CONREP Contract"). (*Id.* ¶ 7.)

20.    The CONREP Contract states:

> [HRC] shall provide all non-physician, CONREP STRP services (hereinafter referred to as STRP Required Services) required as part of this Agreement.
>
> The provision of physician services shall be provided through a separate agreement between DSH and an alternate contractor/contractors (hereinafter referred to as "CONREP Physicians"). The Contractor shall cooperate with the CONREP Physicians to provide all services associated with required treatment and care to CONREP STRP patients pursuant to the CONREP Physician's direction.
>
> 1) Except for the provision of physician services, [HRC] shall provide services consistent with the CONREP STRP Required Services, including but not limited to:
>    a. Forensic Individual Contacts,
>    b. Group Contacts,
>    c. Case Management services,
>    d. Collateral Contacts,
>    e. Substance Abuse Screenings, and
>    f. Staff attendance at Regional Meetings and Forensic Trainings.
>
> 2) The Contractor shall provide all STRP Required Services pursuant to the CONREP Policy and Procedures Manual (provided by the DSH Contract manager) with a focus on relapse prevention, supporting patient recognition of patterns that lead to offenses, and the development of alternative behaviors.

(*Id.*)

21.    While at HRC, a CONREP physician would have prescribed Plaintiff's medication. (*Id.* ¶ 8.)

22.    The prescription would have been provided to a local pharmacy. (*Id.*)

23.    The pharmacy would fill the prescription, bill the financially responsible state entity (*e.g.* CONREP, DSH), and deliver the medication to HRC. (*Id.*)

24.    HRC's responsibility was to prepare the medication and provide it to the patient for self-administration. (*Id.* ¶ 9.)

25.    HRC would also track a prescription and, when the quantity was low (*i.e.*, seven days of remaining doses), request a refill if the medication was refillable. (*Id.*)

26. The specific CONREP program tasked to find an appropriate residential facility for Plaintiff was the Central Valley Conditional Release Program, administered by Harper Medical Group, Inc. (*Id.* ¶ 11.)

27. On June 29, 2017, Rhonda Love, the Community Program Director at Harper Medical Group, sent a letter to Defendant about Plaintiff's potential placement at HRC. (*Id.*)

28. HRC accepted and Plaintiff was transferred to HRC on July 6, 2017. (*Id.* ¶¶ 12–13.)

29. Upon arrival at HRC, Plaintiff came with a prescription for pramipexole ordered by Leif Skille, M.D., a DSH psychiatrist. (*Id.* ¶ 14.)

30. The medication was provided by HRC continuously until July 19, 2017,[3] when the pramipexole prescription ran out. (*Id.* ¶ 15.)

31. On July 20, 2017, Dr. Sharman became Plaintiff's physician, which resulted in a new prescription, and HRC facilitated its fulfillment. (*Id.* ¶ 16.)

32. HRC kept records as to the preparation of the medication and whether Plaintiff self-administered. (*Id.* ¶ 17.)

33. Defendant was not responsible for preparing any medication for Plaintiff. (*Id.* ¶ 18.)

34. Plaintiff admits to obtaining at least a quarter gram of methamphetamine on or about September 21, 2017. (Allingham Decl. ¶ 10; ECF No. 71-3, Ex. 9, Webster Depo., p. 51:12–16.)

35. Plaintiff consumed that quantity "over a couple of days." (*Id.*)

36. Plaintiff knew that possession and use of methamphetamine was a violation of the *Terms and Conditions of Outpatient Treatment*. (ECF No. 71-3, Ex. 7, DSH Files, WEBSTER_000034.)

37. On September 27, 2017, Plaintiff provided a urine sample for drug screening purposes. (ECF No. 71-3, Ex. 6, Haskins Decl. ¶ 19.)

---

[3] Although written as July 19, 2018 in the Declaration of Natalie Haskins, (*see* Haskins Decl., ¶ 15), in light of the revocation of Plaintiff's outpatient status in October 2017, this appears to be a clerical error that should read July 19, 2017.

38. On October 2, 2017, the result indicated positive for methamphetamine. (*Id.* ¶ 20.)

39. On the same day, Plaintiff was informed that his outpatient status could be revoked. (*Id.*)

40. Between October 2, 2017 and October 11, 2017, Defendant communicated with Rhonda Love and other CONREP personnel regarding how best to handle Plaintiff's methamphetamine use. (*Id.* ¶ 21.)

41. On October 11, 2017, Plaintiff called his former physician at DSH in Napa and left what was considered a threatening message for reasons unknown. (*Id.*; ECF No. 71-3, Ex. 9, Webster Depo., pp. 59:24–60:25.)

42. The combination of the positive drug test and what was considered a threatening message were deemed sufficient to revoke Plaintiff's outpatient status. (ECF No. 71-3, Ex. 6, Haskins Decl. ¶ 21.)

43. On October 13, 2017, Defendant submitted a request to revoke Plaintiff's outpatient status. (*Id.* ¶ 22.)

44. Defendant executed the DSH form, *Involuntary Hospitalization Pending Revocation Hearing*, that resulted in the county sheriff arriving at HRC to take Plaintiff into custody. (*Id.*)

45. Upon the sheriff's arrival at HRC, Plaintiff stuck a toothbrush into his own eye. (*Id.* ¶ 23; ECF No. 71-3, Webster Depo., pp. 64:16–66:5.)

46. In his own words, Plaintiff describes the incident:

> So my toothbrush was sitting there on my dresser, and I picked it up and sat on the edge of the bed and put it to my eye and just—and pounded it and it went in and it struck—struck something hard, and I just kept hitting it, finally, and guess this was like the eye socket, and it broke through the—socket, and instead of killing me, you know, going—going up and into my brain, it went—it went down, the toothbrush went down. And it was just like—and it was just like, wow, you know, and it was all I could do to do that. You know, I mean, I didn't really want to die, but I just felt so bad about what had happened.

(ECF No. 71-3, Webster Depo., pp. 65:14–66:1.)

47. Defendant retained Dr. David Mathis, M.D. ("Dr. Mathis") to provide an independent medical assessment and written report. (Allingham Decl. ¶ 9; ECF No. 71-3, Ex. 8,

11

1  Correctional Medical Expert Report of David M. Mathis, MD, FAAFP, CCHP ("Mathis
2  Report").)
3     48.   His report titled *Correctional Medical Expert Report of David M. Mathis, MD,*
4  *FAAFP, CCHP-P*, is filed concurrently. (*Id.*)
5     49.   Dr. Mathis holds a current California medical license and has twenty (20) years of
6  experience in corrections as a provider and medical director. (*Id.* at 1.)
7     50.   He is a Certified Correctional Healthcare Professional (CCHP) and the more
8  specialized CCHP Physician (CCHP-P). (*Id.* at 1–2.)
9     51.   Dr. Mathis reviewed over thirty-five (35) assessments, medical reports and related
10 documents from DSH, Plaintiff's deposition, and HRC's records, all of which are directly related
11 to Plaintiff's claims. (*Id.*, pp. i–iv.)
12    52.   Dr. Mathis came to five (5) conclusions, stated to a reasonable degree of medical
13 certainty, regarding the case, which are as follows:

> 1. Plaintiff's restless syndrome was not a serious medical problem.
> 2. Plaintiff did not receive pramipexole several times during his stay at the HRC.
> 3. Despite the missed doses, HRC and Defendant reasonably and appropriately followed the procedure to obtain a new prescription for pramipexole.
> 4. The missed doses of pramipexole by Plaintiff did not cause, nor contribute to, Plaintiff's suicide attempt.
> 5. Plaintiff's suicide attempt resulted from his methamphetamine addiction, methamphetamine illicit use, and the revocation of his potential release due to his addicted behavior.

(*Id.* at 13.)

53.   Plaintiff complained of lost sleep due to the symptoms of his restless leg syndrome. (Allingham Decl. ¶ 3; ECF No. 24, p. 4; ECF No. 71-3, Ex. 8, Mathis Report, p. 10; ECF No. 71-3, Ex. 9, Webster Depo., pp. 21:16–22:12.)

54.   The nature of pramipexole is that its effects occur quickly, typically 90–120 minutes after intake. (ECF No. 71-3, Ex. 8, Mathis Report, p. 8.)

55.   Plaintiff testified in his deposition that he slept the first night the medication resumed. (ECF No. 71-3, Ex. 9, Webster Depo., p. 23:3–8.)

12

56. Plaintiff had a long history of mental health issues induced by methamphetamine use. (ECF No. 71-3, Ex. 7, DSH Files, WEBSTER_000001–04.)

### D. Parties' Positions

Defendant argues that judgment should be entered in her favor for the following reasons: (1) Plaintiff's missed doses of medication did not cause or contribute to Plaintiff's injury; (2) Defendant's refusal to pay for Plaintiff's prescription was not a breach of duty under the objective deliberate indifference standard; (3) Defendant reasonably and appropriately followed the procedure to obtain, or refill, Plaintiff's prescription; (4) Defendant was not personally responsible for administering medication to Plaintiff, and therefore any failure to administer Plaintiff's medication was not a breach of duty under the objective deliberate indifference standard; and (5) Plaintiff's restless leg syndrome was not a substantial risk of suffering serious harm, even if untreated. (ECF No. 71-1.)

In opposition, Plaintiff contends that Defendant relies on false, fraudulent statements and forged documents, and that he is attacking her character for untruthfulness. (ECF No. 83.) On the other hand, Plaintiff argues that he has provided over one hundred and fifty exhibits that are self-authenticating and admissible to support his claim that Defendant violated his Fourteenth Amendment rights through her deliberate indifference and denial of medical or psychological care. Plaintiff argues that he has proven the four elements for a deliberate indifference claim in violation of the Fourteenth Amendment, providing evidence that: (1) Defendant made an intentional decision related to the condition of Plaintiff's confinement by not paying for Plaintiff's restless leg syndrome medication; (2) Defendant's failure put Plaintiff at substantial risk of suffering serious harm because he was deprived of sleep; (3) Defendant did not take reasonable measures to abate that risk because she did not call anyone to obtain Plaintiff's medication, and a reasonable official would have appreciated the high degree of risk involved; and (4) by not taking measures to intervene by providing Plaintiff's medication or re-hospitalizing Plaintiff, Defendant caused Plaintiff's injuries when he eventually attempted to commit suicide.

Defendant argues in reply that Plaintiff's opposition is little more than conjecture, personal opinion, inadmissible documents, and shifting legal arguments unsupported by evidence,

and therefore fails to create a triable issue of material fact. (ECF No. 88.) Further, Plaintiff has not submitted an expert opinion rebutting Dr. Mathis's conclusions, and unopposed, Dr. Mathis's conclusions are undisputed and dispositive.

### E. Analysis

The Fourteenth Amendment governs claims of constitutionally inadequate medical care brought by civilly committed plaintiffs. *Hydrick v. Hunter*, 500 F.3d 978, 996 (9th Cir. 2007), cert. granted, judgment vacated on other grounds, 556 U.S. 1256 (2009). As a civil detainee, Plaintiff's right to medical care is protected by the substantive component of the Due Process Clause of the Fourteenth Amendment. *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982); *Mitchell v. Washington*, 818 F.3d 436 (9th Cir. 2016). A claim of denial of the right to adequate medical care under the Fourteenth Amendment is analyzed under an objective deliberate indifference standard. *Gordon v. Cty. of Orange*, 888 F.3d 1118 (9th Cir. 2018). In order to demonstrate deliberate indifference to a detainee's serious medical needs, a plaintiff must satisfy the following four elements: (1) each individual defendant made an intentional decision related to the conditions of the plaintiff's confinement; (2) those conditions put the plaintiff at risk of suffering serious harm; (3) the defendant failed to take reasonable steps to abate the risk even though a reasonable official in those circumstances would have understood the high degree of risk involved, making the consequences of their actions obvious; and (4) by failing to take those actions, the defendant caused the plaintiff's injury. *Gordon*, 1124–25. The *Gordon* standard represents an objective test against which the Court measures the defendant's behavior.

#### 1. Defendant's Duty to Pay for or Administer Plaintiff's Medication

Defendant argues that she was not under any duty to pay for Plaintiff's prescription medication pursuant to the California Code of Regulations, and similarly was not under any duty to administer Plaintiff's prescription medication. Plaintiff, however, contends that Defendant was responsible to pay for or provide for Plaintiff's medication as the Director of HRC, and her failure to obtain the medication led to Plaintiff's lack of sleep, decompensation, and suicide attempt. Although Plaintiff cites to certain exhibits attached to his opposition, and claims that they are self-authenticating, the Court finds that many of them are unverified, incomplete, or not relevant

1 to the factual allegation for which Plaintiff cites to them.

2 For example, Plaintiff states that Defendant "Failed in her DUTY to record the occurrences, or notify the appropriate agenc[ies]" about Plaintiff's missed doses of his medication and cites to Exhibit 100-42, which appears to be an excerpt from a deposition transcript. (ECF No. 83, pp. 24, 117.) Plaintiff identifies the deponent as Rhonda Love, who is no longer a party to this action, and appears to argue that Ms. Love's agreement with the statement that "you didn't find out that Mr. Webster was not sleeping and without his medication until nearly a month, month-and-a-half after it had occurred," supports his argument that Defendant Haskins was therefore derelict in her duty to obtain Plaintiff's medication. (*Id.*) However, Plaintiff's conclusory assertions regarding the contents, authenticity, and relevance of the exhibits is not sufficient for these documents to be self-authenticating or to prove Plaintiff's arguments. This deposition testimony does not raise a material issue of fact that Defendant had a duty to Plaintiff regarding his medication. The deposition testimony does not support that Defendant had a duty to Plaintiff regarding his medication.

Similarly, Defendant argues that each section of the California Codes of Regulations ("CCR") cited by Plaintiff in support of the proposition that Defendant owed Plaintiff a duty to pay for his medications, does not apply or does not actually require Defendant to pay for medication. (ECF No. 88, pp. 6–8.) The Court agrees. Plaintiff has not identified any authority or provided any admissible evidence to demonstrate that Defendant had a duty to pay for Plaintiff's medication. Further, it is undisputed that Defendant is neither a physician nor a registered nurse, and she was not responsible for the preparation of Plaintiff's medication for self-administration. (UMF 18, 33.)

Accordingly, the Court finds that Defendant did not have a duty to pay for or administer Plaintiff's prescription medication, and therefore did not breach any duty of care when Plaintiff missed several doses of his pramipexole during August 2017.

**2.  Causation Between the Missed Doses and Plaintiff's Injuries**

Although the parties do not agree on the specific number of doses missed or the dates on which they were missed, they agree that during Plaintiff's time at HRC, he missed several doses

15

of pramipexole, resulting in loss of sleep. (UMF 52, 53.) Defendant contends that those missed doses occurred between August 1 and 5, 2017 only, (UMF 52, 53), while Plaintiff does not identify specific dates, rather arguing that HRC's documentation of medication administration is fraudulent and a forgery starting on August 18, 2017 until October 13, (ECF No. 83, p. 23).

The following facts are undisputed. Plaintiff was able to sleep the first night he resumed taking the pramipexole. (UMF 55.) On or about September 21, 2017, Plaintiff obtained at least a quarter gram of methamphetamine and consumed that quantity over a couple of days. (UMF 34, 35.) Plaintiff provided a urine sample for drug screening purposes on September 27, 2017, and the result indicated positive for methamphetamine on October 2, 2017. (UMF 37, 38.) Plaintiff was informed on October 2, 2017 that his outpatient status could be revoked. (UMF 39.) On October 11, 2017, Plaintiff called his former physician at DSH in Napa and left what was considered a threatening message. (UMF 41.) The combination of the positive drug test and the message were deemed sufficient to revoke Plaintiff's outpatient status, and Defendant submitted a request to revoke Plaintiff's outpatient status on October 13, 2017. (UMF 42, 43.) When the sheriff arrived at HRC on October 13, 2017 to take Plaintiff into custody, Plaintiff attempted to commit suicide by sticking a toothbrush into his own eye. (UMF 45, 46.)

The crux of Plaintiff's claim in this action is that the missed doses of pramipexole in August 2017 caused him to be unable to sleep for several days in a row, causing him to decompensate to the point that he attempted to commit suicide. This is the claim which the Court originally found cognizable against Defendant Haskins, and the claim upon which Plaintiff's first amended complaint proceeds. (ECF No. 27.) Plaintiff does not address whether events that occurred after the missed doses, specifically Plaintiff's methamphetamine usage and the revocation of Plaintiff's outpatient status, had any bearing on his attempted suicide. Rather, Plaintiff argues that his drug usage, and Defendant's failure to immediately revoke his outpatient status, was another example of Defendant's failure to prevent his suicide attempt. (*See* ECF No. 83, p. 22.)

However, Plaintiff's methamphetamine usage is not at issue in this case, and does not provide support for Plaintiff's Fourteenth Amendment claim against Defendant Haskins. Rather,

16

the Court finds that the methamphetamine usage and revocation of Plaintiff's outpatient status are more appropriately viewed as intervening events during the nearly two months that passed between the missed doses and Plaintiff's suicide attempt. Though Plaintiff appears to argue that his decompensation in early August due to loss of sleep continued up to his suicide attempt, at no point does he even allege that he continued to lose sleep, or to experience further decompensation as a result of loss of sleep, after he resumed taking pramipexole. In light of these intervening events and the passage of time, the connection between the missed doses and Plaintiff's attempted suicide is too attenuated for the Court to find that the missed doses were the cause of Plaintiff's attempted suicide.

Therefore, even if the Court were to find that Defendant had a duty to pay for or administer Plaintiff's medication, the undisputed facts do not support Plaintiff's contention that the missed doses led to Plaintiff's attempted suicide.[4]

### 3. Medical Expert Opinion

Finally, even assuming that Plaintiff had provided sufficient evidence to create triable issues of fact regarding Defendant's duty to pay for or administer his medication or the causation between his missed doses of medication and his suicide attempt, Plaintiff's claim against Defendant fails.

Defendant provides the expert medical opinion of Dr. Mathis, who opines that: Plaintiff's restless leg syndrome was not a serious medical problem; while Plaintiff missed doses of pramipexole several times during his stay at HRC, Defendant reasonably and appropriately followed the procedure to obtain a new prescription for pramipexole; the missed doses did not cause, nor contribute to, Plaintiff's suicide attempt; and Plaintiff's suicide attempt resulted from his methamphetamine addiction, methamphetamine use, and the revocation of his potential release. (UMF 52.)

Though Plaintiff argues to the contrary, Plaintiff has not provided evidence to rebut Dr.

---

[4] The Court notes that the primary injury Plaintiff alleges as a result of the missed doses of pramipexole is his suicide attempt. However, to the extent Plaintiff alleges harms related to sleep deprivation and unrelated to the subsequent suicide attempt, Plaintiff's claims nevertheless fail. As discussed *supra*, III.E.1., the Court finds that Defendant had no duty to pay for or administer Plaintiff's medication, and therefore is not liable for any long- or short-term injuries Plaintiff suffered as a result of the missed doses.

17

1 Mathis's report. As discussed above, Plaintiff is not a medical expert and is therefore not
2 qualified to opine on whether restless leg syndrome (and the resulting lack of sleep) is a serious
3 medical problem or whether Dr. Mathis's opinion is accurate. *See* Fed. R. Evid. 702. Other than
4 his own opinion, Plaintiff has submitted no admissible evidence that Defendant's conduct was
5 medically unacceptable or that she failed to take reasonable steps to abate a risk that Plaintiff
6 would suffer serious harm, even though a reasonable official in those circumstances would have
7 understood the high degree of risk involved. *Gordon v. Cty. Of Orange*, 888 F.3d 1118, 1124–25
8 (9th Cir. 2018). Summary judgment should therefore be granted.

## IV. Conclusion and Order

Plaintiff has largely relied on unsupported assertions and inadmissible evidence to rebut the expert testimony properly submitted by Defendant. With respect to the majority of the material facts, Plaintiff has either conceded that they are undisputed or failed to provide evidence to support the existence of a true dispute. Setting aside unsupported and conclusory arguments, the evidence before the Court, construed in favor of Plaintiff, is insufficient to raise a genuine dispute for trial. The Court therefore concludes that there is no genuine issue of material fact preventing summary judgment in favor of Defendant.

Accordingly, IT IS HEREBY ORDERED as follows:

1. Defendant Haskins' motion for summary judgment, (ECF No. 71), is GRANTED;
2. Judgment shall be entered in favor of Defendant and against Plaintiff; and
3. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:   **March 25, 2022**         /s/ *Barbara A. McAuliffe*       
                                    UNITED STATES MAGISTRATE JUDGE

18